# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

| | |
|---|---|
| JASON THIELE, <br><br> Plaintiff, <br><br> vs. <br><br> BASF CORPORATION, et al., <br><br> Defendants. | No. C18-4081-LTS <br><br> **MEMORANDUM OPINION AND ORDER** |

___

This matter is before me on a motion (Doc. 238) for summary judgment by defendant Givaudan Flavors Corporation (Givaudan). Defendants Sensient Flavors and DSM Food Specialties USA, Inc. have joined in the motion. Doc. 253, 255. Plaintiff Jason Thiele has filed a response (Doc. 245) and Givaudan has filed a reply (Doc. 252). Oral argument is not necessary. *See* Local Rule 7(c).

## I. PROCEDURAL HISTORY

Thiele filed his complaint on September 12, 2018, alleging diversity jurisdiction under 28 U.S.C. § 1332. He asserts claims of negligence (Count I), strict product liability – design, manufacturing and inherent defects (Count II), strict product liability – failure to warn (Count III) and strict product liability – failure to instruct (Count IV). Doc. 1. Givaudan argues Thiele's claims are barred by Iowa's two-year statute of limitations. Trial is scheduled to begin September 13, 2021.

## II. SUMMARY JUDGMENT STANDARDS

Any party may move for summary judgment regarding all or any part of the claims asserted in a case. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with

affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one that "'might affect the outcome of the suit under the governing law.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "the substantive law will identify which facts are material." *Id.* Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.*

An issue of material fact is genuine if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249–50, does not make an issue of material fact genuine.

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248–49. The party moving for entry of summary judgment bears "the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof,

then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

In determining if a genuine issue of material fact is present, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587–88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376–77 (8th Cir. 1996).

## III. RELEVANT FACTS

The following facts are undisputed for purposes of this motion unless otherwise noted:

Thiele filed this lawsuit on September 12, 2018. He worked for American Pop Corn Company (APC) from March 2004 to May 2011. Thiele was hired by APC to be a mixer, which required him to hand-pour flavorings into 300- to 500-gallon mixing tanks containing heated oil. Doc. 238-1 at 1-2; Doc. 245-1 at 1. The parties dispute the extent of knowledge Thiele had about the risks his job posed to his respiratory health. He admits he was aware that his work had the "potential" for "risks" but states he did not believe these were greater than at any other workplace and that APC's safety precautions would protect him from any potential risks. Doc. 245-1 at 2 (citing Doc. 238-3 at 41-42). Givaudan states Thiele has repeatedly admitted that he was aware of a respiratory risk

3

associated with flavors and diacetyl that could affect his ability to breathe. Doc. 252-1 at 2 (citing Doc. 238-3 at 30, 33, 41-43).[1]

APC had a respiratory protection program that required its employees to wear respiratory protection during certain job duties. Thiele was trained on this program when he started with APC in 2004.[2] He acknowledged his understanding of APC's mandatory respirator policy by signing the Mixing Room Protocol form dated December 17, 2004.

---

[1] Thiele's deposition testimony reflects various admissions to his awareness of the risks associated with his work at APC:

> Q: And why – why was it necessary for you to wear respiratory protection when working in the oil room at APC?
> A: So we wouldn't be breathing in the flavoring.
> Q: Why was breathing in the flavoring hazardous or unhealthy when you were in the mixing room at APC?
> A: Because it was bad for you, I guess.
> Q: Was that something that you were told or educated about when you started at APC?
> A: I believe I was.
> ....
> Q: And one of the things APC told you that might be hazardous for you to inhale were flavoring chemicals in the mix room?
> A: I believe so, yes.
> Q: So you'd agree with me that you were aware of that risk or aware of that hazard when you started at APC?
> [Objection to form of question]
> A: Yes.

Doc. 238-3 at 30. *See also* Doc. 238-3 at 35 ("Q: Do you recall being made aware of a chemical called diacetyl in 2004? A: I believe I was, because that was when I first started. Q: What were you told about diacetyl? A: That it's in the flavoring and could be harmful."); Doc. 238-3 at 42-43 ("Q: But specifically, you had been made aware of dangers associated with flavor products and diacetyl specifically early, early on at your time at APC? A: Yeah. They gave us the safety precautions and stuff. Q: Right. They told you what the risk was, and they told you what the proper way to try to avoid was? A; I believe so, yes.").

[2] The parties dispute the extent of this training. *See* Doc. 245-1 at 3-4. Thiele admits he completed "initial training" on "supplied air respirators" and was given information.

4

He understood that respirators were required so employees would not breathe in the flavoring. Doc. 238-1 at 7; 245-1 at 4.

Thiele was fitted for a cartridge-style respirator in March 2004 when he started working at APC as a mixer. The parties dispute whether Thiele was required to always wear his respirator in the mixing room (and/or the oil room).[3] Thiele states he was not required to wear his respirator during "emergencies" such as spills of heated flavoring and during end of the week cleanings when he would clean out the flavoring tanks with hot water. Doc. 245-1 at 4. Thiele was aware that failure to comply with the respirator policy could result in discipline and possibly job termination. Thiele states he was never disciplined or terminated for failure to wear a respirator or follow the safety protocols. *Id.*

Thiele took quarterly pulmonary function tests (PFTs) administered by an onsite nurse at APC. Thiele denies knowing the results of these tests but understood that the "cutoff line" for whether he could return to work was "80 percent." *Id.* Thiele's FEV1[4] during his May 17, 2005, PFT was 79.6 percent of the predicted value. Doc. 238-1 at 8. Subsequent tests in 2005 and 2006 were above 80 percent. Doc. 245-1 at 5. Thiele states the first time he was informed that his PFT went below 80 percent was in May 2007. *Id.* At that time, Thiele was not allowed to return to the mixing room while his PFT was below 80 percent. Doc. 245-1 at 2. As a result, Thiele was sent to Craig Bainbridge, M.D., a pulmonologist. Dr. Bainbridge examined Thiele and performed additional testing.

---

[3] The parties' filings are not clear as to whether the oil room and the mixing room are separate rooms at APC or are simply interchangeable names for the same room. There is also occasional reference to the ingredient room, which may or may not be the same room as the oil room and/or the mixing room. Whether these labels refer to one room, two rooms or three rooms at APC has no impact on the analysis set forth herein. For the sake of simplicity, I will generally use the term "mixing room" in this order.

[4] FEV1 is the amount of air a person can force from his or her lungs in one second.

The parties dispute the details of what Dr. Bainbridge told Thiele about his diagnosis and its cause, but it is undisputed he told Thiele he had some breathing issues. Thiele asserts, based on his own deposition testimony, that Dr. Bainbridge told him his breathing issues were not related to APC and he did not know the cause. *Id.* Givaudan asserts, based on Dr. Bainbridge's treatment notes and letters to Greg Hoffman, General Plant Manager at APC, that Dr. Bainbridge told Thiele he was "not sure of the etiology." Doc. 252-1 at 7. The parties also dispute whether Dr. Bainbridge told Thiele that other substances outside of his occupation could be causing the decrease in lung function. Doc. 245-1 at 3. Thiele states he relied on Dr. Bainbridge's opinion and did not discover he had lung disease related to his work at APC until he was diagnosed with flavoring-related bronchiolitis obliterans syndrome by Charles A. Pue, M.D., on November 19, 2017.[5] *Id.*

Givaudan states APC informed Thiele at the beginning of his employment that breathing in the flavorings was hazardous. Doc. 238-1 at 2. It contends APC specifically warned Thiele that the chemical diacetyl could be harmful to his lungs and that he was told there was a chance he could be exposed to chemicals that could detrimentally affect his ability to breathe. *Id.* at 3. Givaudan states APC instructed Thiele on how to avoid or mitigate the risks associated with flavors by using respirators. *Id.* at 4. The parties dispute when Thiele was removed from the mixing room – whether in October 2007 or during 2009. Doc. 252-1 at 9.

---

[5] Givaudan denies this statement about Thiele's reliance on Dr. Bainbridge and argues it does not constitute a material fact because any such reliance would not have been reasonable. Givaudan points to Thiele's knowledge about his instances of non-compliance with APC's respirator policy and the extensive training APC provided regarding the alleged link between exposure to flavors and breathing problems. Givaudan argues that because Thiele was on notice that flavors at APC were a possible cause of his breathing problems and Dr. Bainbridge could not determine the cause of Thiele's breathing problems, Thiele had a continuing duty to investigate his claims. *See* Doc. 252-1 at 8-9 (citing cases).

6

Thiele learned that another APC mixer, Kevin Remmes, had developed breathing problems, but Thiele states he did not know the nature of those problems or why Remmes had them. *Id.* Givaudan argues this is not a material fact based on all the other information that put Thiele on notice of his own breathing problem and its possible cause. Doc. 252-1 at 10. Thiele noticed that another coworker in the mixing room had a cough but did not discuss it with the co-worker or know why the co-worker had a cough. Doc. 245-1 at 5. At some unstated time, Thiele became aware of Remmes' lawsuit against Givaudan and other flavor manufacturers but states he did not know the extent of the claims. *Id.* at 6.

The parties dispute whether Thiele was entirely compliant with APC's respiratory protection program.[6] Doc. 245-1 at 6. Thiele provided some examples of when he was required to wear respiratory protection but did not do so, such as to retrieve an item from the mixing room (like a batch sample), to grab a cart of oil or to clean up spills of powder and liquid flavors. He also entered the mixing room without respiratory protection on approximately a monthly basis to address "emergency" situations, such as when another employee left a valve open on the oil tank. There were times when Thiele entered the mixing room without a respirator when he could not avoid inhaling. There were also instances when he breathed in butter flavoring in the air in the hallway outside of the mixing room while the ventilation system was not working properly. Thiele felt he was also exposed to flavoring products when he was cleaning containers and scoops in the washroom. Doc. 238-1 at 11-15; Doc. 245-1 at 6.

Thiele first noticed breathing difficulties around March 2005. The first symptom was shortness of breath, which occurred while he was at work at APC. This was the first time he had ever experienced shortness of breath. Thiele recalls an instance when

---

[6] This is primarily a dispute about the extent of APC's policy or perceived exceptions to the policy rather than Thiele's actions, which are undisputed. *See* Doc. 238-1 at 11-15; Doc. 245-1 at 6.

he experienced shortness of breath at work and a co-worker asked if he was okay and needed to sit down. In 2005 or 2006, Thiele began noticing it was becoming more difficult to exercise. Thiele does not recall telling anyone at APC that he was experiencing shortness of breath. Doc. 238-1 at 15-17; Doc. 245-1 at 6-7. Thiele developed a cough around 2005 or a little later. He also developed chest tightness while working in the mixing room at APC.[7] He experienced chest tightness that would persist for hours after leaving work. Doc. 238-1 at 18; Doc. 245-1 at 7. Aside from Dr. Bainbridge, Thiele did not see a medical professional for these issues. Thiele states that going to the doctor is not something he usually did. Doc. 238-1 at 18-19; Doc. 245-1 at 7. Thiele was a social smoker from approximately 1995 to 2013. He did not consider his smoking to be a risk to his health. Doc. 238-1 at 20; Doc. 245-1 at 8.

Thiele first considered contacting a lawyer related to his breathing issues in 2017, when his breathing issues worsened. Thiele was seen by Dr. Pue, who is not one of Thiele's treating physicians. Dr. Pue diagnosed Thiele with "flavoring related bronchiolitis obliterans syndrome." Doc. 238-1 at 20. As of February 19, 2020, Thiele had never spoken to any of his treating physicians about bronchiolitis obliterans. Doc. 238-1 at 19-20; Doc. 245-1 at 7-8.

## IV. ANALYSIS

### A. *Parties' Arguments*

Givaudan argues Thiele's claims are barred by Iowa's two-year statute of limitations because there is no genuine issue of material fact that Thiele had knowledge of his injury and its cause, or was on inquiry notice, more than two years before he filed his lawsuit. Its argument is based on (1) Thiele's training at APC and his acknowledgment of APC's respiratory protection program, (2) the pulmonary symptoms he began experiencing in March 2005 and (3) his diminished lung function documented

---

[7] Thiele worked in the mixing room from 2004 through 2009.

by PFT results in May 2007, which caused him to be temporarily removed from the mixing room and for APC to refer him to Dr. Bainbridge, a pulmonologist. Givaudan contends that under Iowa's discovery rule, the latest possible time that Thiele was on notice of a possible injury was May 2007 when his PFT results were below 80 percent and he was sent to a pulmonologist.

Thiele argues he was not aware of any compensable injury until he was diagnosed in 2017 with "flavoring related bronchiolitis obliterans syndrome." He states he experienced a gradual progression of symptoms such that his condition constitutes a pure latent injury. He argues that even if his mild symptoms should have put him on inquiry notice, Dr. Bainbridge's representation that his breathing issues were not related to his work at APC excused any failure to further investigate.

Givaudan argues that a medical diagnosis is not required to put a plaintiff on inquiry notice of an injury as long as the plaintiff knew a problem existed. It contends Thiele's shortness of breath symptoms in 2005 and decreased lung function tests in 2007 put him on inquiry notice and that Dr. Bainbridge's representations do not toll the statute because Dr. Bainbridge did not definitively rule out Thiele's work at APC as a cause.

*B. Applicable Law*

The parties agree that Thiele's claims are subject to Iowa's two-year statute of limitations for personal injury claims.[8] *See* Iowa Code § 614.1(2) (imposing a two-year limitation on claims "founded on injuries to the person or reputation . . ."). "Under the discovery rule, commencement of the limitations period is delayed 'until the plaintiff knows or in the exercise of reasonable care should have known both the fact of the injury and its cause." *K&W Elec., Inc. v. State*, 712 N.W.2d 107, 116 (Iowa 2006) (citation

---

[8] I agree with the parties that Iowa law applies. *See Great Plains Trust Co. v. Union Pac. R.R. Co.*, 492 F.3d 986, 992 (8th Cir. 2007) ("A federal court sitting in diversity jurisdiction applies the statute-of-limitations of the forum.").

9

omitted). "[O]nce a plaintiff learns information that would alert a reasonable person of the need to investigate, the plaintiff 'is on inquiry notice of all facts that would have been disclosed by a reasonably diligent investigation.'" *Skadburg v. Gately*, 911 N.W.2d 786, 794 (Iowa 2018). *See also Kraft v. St. John Lutheran Church*, 414 F.3d 943, 947 (8th Cir. 2005) ("[d]iscovery of the act or omission occurs when the party knows of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery of facts constituting the basis of the cause of action."); *Estate of Montag v. T H Agric. & Nutrition Co.*, 509 N.W.2d 469, 470 (Iowa 1993) ("[T]he statute of limitations [on personal injury claims] begins to run when a plaintiff first becomes aware of facts that would prompt a reasonably prudent person to begin seeking information as to the problem and its cause."). "Issues of due diligence and constructive knowledge depend on inferences drawn from the facts of each particular case . . . . When conflicting inferences can be drawn from the facts, summary judgment is inappropriate." *Foster v. Johns-Manville Sales Corp.*, 787 F.2d 390, 393 (8th Cir. 1986) (citation omitted).

Givaudan has the burden to prove its limitations defense and Thiele has the burden to establish any exception to the limitations period, such as application of the discovery rule. *See Ranney v. Parawax Co., Inc.*, 582 N.W.2d 152, 154 (Iowa 1998). Both parties cite *Ranney* as supporting their position. In that case, the plaintiff was diagnosed with Hodgkin's disease in 1985. He initially suspected that his condition was causally connected to his work with toxic chemicals. *Ranney*, 582 N.W.2d at 153-54. He consulted with various physicians who were unwilling to make a causal finding. *Id.* at 154. In 1987 and 1988, Ranney's wife was in law school and read cases about occupational diseases caused by chemical exposure. *Id.* They discussed the possibility that Ranney's Hodgkin's disease was caused by his exposure to toxic materials at the workplace. *Id.* In 1991, Ranney saw a doctor who confirmed Ranney's theory of causation. *Id.* Ranney filed his workers' compensation case in 1992. *Id.* The commissioner granted summary judgment in favor of the employer's workers'

compensation carrier based on the statute of limitations. This ruling was affirmed on judicial review by the district court.

The Iowa Supreme Court also affirmed the ruling. The Court noted it was undisputed that Ranney had actual knowledge of the nature and seriousness of his condition more than two years prior to filing his lawsuit. *Id.* at 155. The issue was whether he had imputed knowledge of its probable compensable nature. *Id.* The Court rejected Ranney's claim that he suffered from a latent injury, noting that he was diagnosed with Hodgkin's disease in 1985. *Id.* The record also showed he had suspected his disease was caused by workplace exposure to chemicals and by 1987 or 1988, he learned of its possible compensable nature from his wife. The Court stated, "once a claimant knows or should know that his condition is possibly compensable, he has the duty to investigate." *Id.* The Court rejected Ranney's argument that inquiry notice began when his physician informed him of the causal connection. *Id.* at 155-56 ("the lack of an expert opinion supporting causation does not prevent commencement of the statute of limitations under the principle of inquiry notice.") It addressed the fact that Ranney's physicians would not commit one way or another as to the cause of his Hodgkin's disease, stating "[t]he fact that Ranney's actual investigation was unsuccessful in confirming his suspicions does not toll the statute of limitations." *Id.* Specifically, it stated, "[h]is inability to find expert support for his theory of causation within that time does not prevent the limitations period from running." *Id.* at 157.

Notably, the Court distinguished *Bressler v. Graco Children's Prods., Inc.*, 43 F.3d 379 (8th Cir. 1994) and *Baines v. Blenderman*, 223 N.W.2d 199 (Iowa 1974), *superseded by statute*, 1975 Iowa Acts ch. 239, § 26, *as recognized in Langner v. Simpson*, 533 N.W.2d 511, 516-17 (Iowa 1995). *Id.* at 157, n.2. In *Bressler*, the plaintiffs were told their child died of SIDS, rather than by suffocation, and the Eighth Circuit found a factual issue precluding summary judgment as to whether the plaintiffs conducted a reasonably diligent investigation based on the medical opinion regarding the cause of death. *Bressler*, 43 F.3d at 381. In *Ranney*, by contrast, the Iowa Supreme

11

Court noted Ranney was not misled by physicians into believing his chemical exposure did not cause his Hodgkin's disease.

In *Baines*, the plaintiff relied on the statement of his doctor that the loss of vision in his right eye "was an unusual but temporary postoperative side effect" of his back surgery. The court held the trier of fact could find plaintiff was "excusably unaware" of his cause of action until the date he first learned of "the cause and true nature of his injury." *Baines*, 223 N.W.2d at 202. In *Ranney*, and again by contrast, the Iowa Supreme Court noted Ranney knew the nature of his injury when he was diagnosed with Hodgkin's disease in 1985.

Thiele argues that his situation, too, is unlike Ranney's. He states he was never told he had a diagnosed lung disease while he was working at APC, but was only advised of unspecified problems that, he was told, were not related to his work at APC. Doc. 245 at 15-16. He states he was not aware that he had an actual injury, and that it might be compensable, until he was diagnosed with bronchiolitis obliterans in November 2017. *Id*. Givaudan argues *Ranney* supports its position because the Court held that failure to obtain medical confirmation of the cause of a condition was insufficient to create a factual issue on the applicability of the discovery rule once the plaintiff knew of the possible connection between his disease and employment. *See* Doc. 252 at 4, n.5.

I will take *Ranney* and the cases cited therein into account when considering whether there is a factual issue that Thiele was on inquiry notice regarding the fact of his injury and its cause more than two years prior to filing suit. *See K&W Elec., Inc.*, 712 N.W.2d at 116 (Iowa 2006).

### C. *Notice of Fact of Injury*

Givaudan argues it is undisputed that Thiele knew or should have known the fact of his injury in 2005 when he first began experiencing symptoms. I disagree. The evidence establishes that Thiele began experiencing shortness of breath in March 2005, followed by a cough and chest tightness, but it appears that his symptoms were so mild

12

that neither he nor APC took any action. Moreover, while Thiele also had a PFT below 80 percent in May 2005, it is not clear from the record whether APC informed Thiele of these results or took any action at that time. A reasonable jury could conclude there was no reason for Thiele to have known that a problem existed at that time.

By 2007, however, the undisputed facts establish that Thiele knew or should have known that he had a respiratory problem. It is undisputed (1) that Thiele knew his job involved risks related to breathing issues[9] and (2) that he had continuing pulmonary symptoms and abnormal PFT results that led APC to temporarily remove him from the mixing room and refer him to a respiratory specialist. Nothing in Dr. Bainbridge's notes or Thiele's deposition testimony suggests that Dr. Bainbridge told Thiele he did not have a respiratory problem. To the contrary, Thiele acknowledged that Dr. Bainbridge told him he had a breathing problem. *See* Doc. 245-3 at 17 ("All I remember him telling me was that I had some problems but it wasn't related from Jolly Time, but he didn't know what the cause was."); *Id.* ("He just, like I said, dumbed it down for me basically, that I had some breathing issues, but it wasn't caused by Jolly Time and he didn't know what the cause was.").

Thiele did not need to know the extent of the problem or have a formal diagnosis to be on inquiry notice of the fact of his injury at that time. *See Franzen v. Deere & Co.*, 377 N.W.2d 660, 662 (Iowa 1985) ("the duty to investigate does not depend on exact knowledge of the nature of the problem that caused the injury. It is sufficient that the person be aware that a problem existed. One purpose of the inquiry is to ascertain its exact nature."); *Adkison v. G.D. Searle & Co.*, 971 F.2d 132, 136 (8th Cir. 1992) ("[A] doctor's diagnosis of a causal connection is not necessary for the limitations period to start running."). Based on the summary judgment record, there is no genuine issue of

---

[9] While the extent of Thiele's knowledge is disputed, it is apparent from the record, including Thiele's own admissions in his deposition, that he had some knowledge of the potential risks of his job and that these risks were respiratory in nature. *See supra* at 4, n.1.

13

material fact that Thiele knew or should have known by the end of 2007 that he was suffering from a respiratory injury.

## D. *Notice of Cause of Injury*

For Givaudan and the defendants who joined in Givaudan's motion to be entitled to summary judgment, they must also establish there is no genuine issue of material fact that Thiele knew or should have known the cause of his injury more than two years before he filed suit. *See K&W Elec., Inc.*, 712 N.W.2d at 116 ("Under the discovery rule, commencement of the limitations period is delayed 'until the plaintiff knows or in the exercise of reasonable care should have known both the fact of the injury and its cause.'"). Thiele argues he did not know of the cause until 2017, when he was diagnosed by Dr. Pue, because he had relied on Dr. Bainbridge's representation that Thiele's breathing issues were not related to his work at APC. *See* Doc. 245-3 at 18 ("That doctor telling me that it wasn't related to American Pop Corn, I kind of took his word for it."); Doc. 238-3 at 55 ("for the longest time I didn't know anything because, like that Dr. Bainbridge said, you know, I didn't know what was wrong . . . .").

The record concerning Dr. Bainbridge's treatment of Thiele consists of the following:

On May 18, 2007, Dr. Bainbridge wrote a letter to Greg Hoffman, General Plant Manager at APC, stating:

> Thank you for allowing me to see Jason Thiele. As you know, he has given me permission to write to you concerning his respiratory condition. As I read the records that you kindly supplied, his FEV1 has decreased from March of 2004, recorded at 4.82 liters, down to 4.22 on 05/01/2007. I did repeat his functions and measured some other parameters today in the office, and his FEV1 was 4.04.
>
> I am not sure of the etiology. Certainly, he has been well protected in the mixing room for the past three years but, given this decrement in pulmonary function, I have asked that he not be placed back in the mixing room at least until I can evaluate him again in six weeks. I understand that that is what

14

has been done anyway. I have also given him some directions such that perhaps we can ameliorate other substances that are not associated with his occupation, which could cause a decrease in pulmonary function. I will be reviewing him again in six weeks' time.

Doc. 245-3 at 28. Dr. Bainbridge wrote Hoffman again on July 2, 2007, stating:

> Thanks for allowing me to see Jason again. His pulmonary functions are stable. He does have some mild obstructive airways disease. Again, I am not sure of the etiology. He has been well protected in the mixing room and I think you should allow him to return to the mixing room at this point under careful supervision. I have recommended that he continue your excellent protection that you have established for the mixing room function. I am going to see him again in 2 months for a repeat pulmonary function study. If there is any significant deterioration, I think he will need to permanently be removed from the mixing room. However, for now I have no proof that the mixing room environment has affected him at all.

Doc. 245-3 at 27. Dr. Bainbridge's note dated November 21, 2007, states:

> This is a gentleman with some mild obstructive airways disease. The patient has given me permission to send a copy of this to the American Popcorn Company, Attention: Mr. Greg Hoffman. Reference is made to my evaluation on 5/18/2007. This gentleman is involved in the mixing room, and he has had some obstructive airways disease. American Popcorn and Dave Sitzman have kindly supplied his longitudinal record of PULMONARY FUNCTION STUDIES, starting on 03/04/2004. His last FUNCTION was done 10/02/2007, which showed an FEV1 of 4.14, 75.9% of predicted. FVC is 6.26, 91% of predicted. The FEF25-75% is 2.58, 45%. There is no significant improvement in flow after bronchodilator. Total lung capacity is 7.37, 82%. DLCO is 40.2, 111% of that predicted, suggesting no loss of pulmonary capillary bed. Impression is obstructive airways disease, mild; not significantly changed from his previous PULMONARY FUNCTION STUDY done here in July.
>
> He has really gotten along quite well. No wheezing. He is able to do his work. He really does not have any particular complaint. We have not treated him with any medication.
> . . . .
> IMPRESSION: Obstructive airways disease, mild and stable.

15

> PLAN: I will allow him to return to the mixing room. He does have protective respiratory equipment. I would like to see him again in about four months and, at that time, would like to review his SPIROMETRY.

Doc. 245-3 at 25. It is not clear whether Dr. Bainbridge communicated to Thiele the information in his treatment notes and letters to Hoffman. Thiele relies on his deposition testimony about what Dr. Bainbridge told him. *See* Doc. 245-3 at 18 ("That doctor telling me that it wasn't related to American Pop Corn, I kind of took his word for it.").

Iowa's discovery rule "is based on a theory that a statute of limitations should not bar the remedy of a person who has been excusably unaware of the existence of [a] cause of action." *Franzen*, 377 N.W.2d at 662. The Iowa Supreme Court and Eighth Circuit (in applying Iowa law) have found that due diligence in investigating the cause is a question of fact when plaintiffs are given a medical opinion about the cause of injury. *See Baines*, 223 N.W.2d at 202-03 (concluding in medical malpractice action that trier of fact could find plaintiff was excusably unaware of his cause of action based on doctor's opinion that loss of vision was just a temporary postoperative side effect, rather than the result of malpractice); *Bressler*, 43 F.3d at 381 (concluding whether plaintiffs conducted a reasonably diligent investigation was a jury question because medical opinion assured plaintiffs that child had died of a natural cause unrelated to the cradle swing and there were no obvious dangers or warnings but, on the other hand, a reasonable jury could conclude plaintiffs should have investigated further based on the child's position in the swing and its irregular motion despite the doctor's opinion); *cf. Ranney*, 582 N.W.2d at 157, n.2 (distinguishing *Bressler* because "Ranney was not misled by his physicians into believing that his exposure to chemicals did *not* cause his Hodgkin's disease. Rather, as Ranney testified, the physicians he consulted would not commit themselves, one way or the other.") (emphasis in original).

16

Here, there is a genuine issue of material fact as to whether Thiele conducted a reasonably diligent investigation as to the cause of his injury.[10] When viewing the facts in the light most favorable to Thiele, a reasonable jury could find both (1) that Dr. Bainbridge told Thiele his breathing issues were not related to his work at APC and (2) that it was reasonable for Thiele to rely on Dr. Bainbridge's representation. *See Hildebrandt v. Allied Corp.*, 839 F.2d 396, 399 (8th Cir. 1987) (concluding it could not be said as a matter of law that plaintiff had knowledge of the cause of his medical problems when he was told by the company doctor that there was no correlation between his symptoms and his exposure to chemicals at work); *Childs v. Haussecker*, 974 S.W.2d 31, 45 (Tex. 1998) ("When medical experts consistently reject a layperson's suspicions concerning the cause of symptoms by expressly refuting an occupational connection or by suggesting exclusively causes that are not work-related, a fact question ordinarily arises about what reasonably should be known by the plaintiff and what further action the plaintiff should have taken, even if the plaintiff knows that co-workers suffer from similar symptoms."). Dr. Bainbridge is a pulmonary specialist who had access to multiple PFT tests for Thiele and did not object to APC allowing Thiele to continue working in the mixing room with the protective equipment supplied by APC. A reasonable jury could conclude Thiele was justified in failing to conduct further investigation based on Dr. Bainbridge's purported representation and that he did not know, nor should he have known, the cause of his injury more than two years prior to filing suit.

Of course, a reasonable jury could also conclude Dr. Bainbridge did not eliminate APC as a cause of Thiele's breathing problems but instead told Thiele he was unsure of the etiology. It could also conclude that Thiele was not justified in relying on Dr.

---

[10] The record does not support Thiele's claim of fraudulent concealment, as he cites no evidence that he was prohibited from conducting a reasonably diligent investigation based on any affirmative act by defendants. *See Roth v. G.D. Searle & Co.*, 27 F.3d 1303, 1308 (8th Cir. 1994) ("Iowa courts apply the fraudulent concealment doctrine if a plaintiff shows: (1) an affirmative act by the defendant to conceal the cause of action, and (2) that the plaintiff diligently attempted to discover his or her cause of action.").

17

Bainbridge's opinion because Thiele did not disclose the fact that he had sometimes entered the mixing room without a respirator and that Thiele should have investigated further based on all the information he had concerning the nature and risks associated with his job. *See Baysinger v. Schmid Prods. Co.*, 514 A.2d 1, 4 (Md. 1986) (concluding that whether a reasonably prudent person should have undertaken a further investigation after two doctors told her they were unsure about the cause of her illness was a matter about which reasonable minds could differ making summary judgment inappropriate); *Ranney*, 582 N.W.2d at 157 ("[h]is inability to find expert support for his theory of causation within that time does not prevent the limitations period from running.").[11]

Nonetheless, when viewing the record in the light most favorable to Thiele, there are genuine issues of material fact as to (1) what Dr. Bainbridge told him (or did not tell him) about the cause of his breathing problems and (2) based on that representation, whether Thiele conducted a reasonably diligent investigation into the cause of his breathing problems such that he knew or should have known of the cause more than two years prior to the time he filed suit. These are issues for the jury to resolve. As such, I cannot conclude that Thiele's action is barred by Iowa's two-year statute of limitations as a matter of law.

---

[11] While the *Ranney* Court found the statute of limitations barred Ranney's claim, the Court concluded the limitations period began running when Ranney learned the possible cause from his wife's legal studies. *See Ranney*, 582 N.W.2d at 156 ("We agree with the industrial commissioner that by 1987 or 1988, at the latest, Ranney had enough information to trigger his duty to investigate."). It rejected Ranney's argument that his physicians' inconclusive opinions as to the cause of his Hodgkin's disease created a factual issue on the applicability of the discovery rule. *Id. Ranney* is distinguishable for two reasons. First, Ranney was searching for a medical opinion to confirm what he already suspected was the cause. Second, when viewing the facts in the light most favorable to Thiele, Dr. Bainbridge provided an opinion *eliminating* a possible cause, rather than refusing to say one way or another, making this case more like *Bressler* and generating a fact issue as to whether it was reasonable for Thiele to rely on that alleged opinion based on all the information available to him.

18

## V.  CONCLUSION

For the reasons set forth herein, Givaudan's motion (Doc. 238) for summary judgment is **denied**.

**IT IS SO ORDERED.**

**DATED** this 6th day of January, 2021.

_____
Leonard T. Strand, Chief Judge